**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Shelton PETERSON, Defendant-Appellant.**

**No. 17030.**

United States Court of Appeals, Seventh Circuit.

April 30, 1970.

Rehearing Denied June 8, 1970.

**1358**

Ronald P. Alwin, Chicago, Ill., for defendant-appellant.

Thomas A. Foran, U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Michael B. Nash, Nicholas J. Etten, Asst. U. S. Attys., of counsel.

Before KNOCH, Senior Circuit Judge, and KILEY and CUMMINGS, Circuit Judges.

KNOCH, Senior Circuit Judge.

Defendant-appellant Shelton Peterson also known as Shelby Johnson and one Lenelve Warren Whitelaw were indicted on a charge of violation, in Count I, of Title 26 U.S.C. § 4705(a), (unlawful sale of narcotics), and, in Count II, of Title 21 U.S.C. § 174 (receiving, concealing, buying, selling; facilitating transportation, concealment and sale of narcotics, etc.). Judgment was entered on a jury verdict of guilty, and defendant was sentenced to serve a term of 5 years, to run concurrently with a prior sentence of 4 to 8 years imposed by the Circuit Court of Cook County, Illinois.

Defendant appealed from denial of his motions for judgment of acquittal and

* In the light of opinions rendered subsequent to his main brief, e. g., United States v. Marine, 7 Cir., 1969, 413 F.2d 214; United States v. Gregg, 7 Cir., 1969, 414 F.2d 943, defendant abandoned in his reply brief the issue of the co-defendant's incriminating statement which as quoted in the trial made no reference to this defendant and was admitted in evidence only as to the co-defendant.

for a new and separate trial. Defendant presents the following issues for review:

"1. Did the trial court err in its refusal to instruct the jury as to the law applicable to missing witnesses where the government did not call an informer who could have resolved the issue of the identity of the defendant?

"2. Did the court err in admitting in evidence the post-arrest confession of a co-defendant?*

"3. Should defendant's motion for a judgment of acquittal on Count I have been granted because the government failed to prove the lack of a written order form?

"4. Did the court's instructions that possession is sufficient to authorize conviction unless defendant explains his possession to the satisfaction of the jury violate defendant's Fifth Amendment right not to be called as a witness against himself?

"5. Did the court's instruction that if possession of heroin is shown the government need not prove importation of knowledge thereof invade the province of the jury and reduce the offense to one of mere possession?"

At the trial Federal Bureau of Narcotics Agent Carroll Gibson testified that he was with an informant, Nathaniel Farrell, whom he had searched to check whether he had money or narcotics on his person, on the evening of September 22, 1965, when they spoke to a number of persons at different locations and when Mr. Farrell made a telephone call in a pool room on Garfield Boulevard, (5500 South in Chicago) after which Agent Gibson gave him $125.00 of government-advanced funds, and both men stepped outside.

After a short time they were joined by the defendant whom Agent Gibson knew as Shelby Johnson.

Agent Gibson on cross examination testified that he had seen the defendant prior to September 22, 1965, sometime that same year, but not since September 22, 1965, until the time of the trial. Although he had never been introduced to defendant as "Shelby Johnson" or heard him say "I am Shelby Johnson," he knew of his own personal knowledge that defendant used that name. He also described defendant at the time of the offense as weighing about 170 pounds, but considered him to weigh only 160 or 165 pounds at the time of the trial in January 1968.

Agent Gibson testified that he overheard Mr. Farrell ask defendant if he could get some "jive," which Agent Gibson said was slang for heroin. Defendant said he could, and Mr. Farrell gave the $125.00 to defendant who told him to wait at 55th Place parallel to an empty lot, "off of Indiana." About 20 minutes after they had driven there Agent Gibson and Mr. Farrell were joined by defendant and his co-defendant, known to Agent Gibson as "Tootie." Mr. Farrell got out of the car. Agent Gibson heard his request for the "jive," defendant's reply that he would get it, and defendant's statement to the co-defendant that defendant had the money. Defendant then said to wait at 55th (Garfield Boulevard) and Indiana, and Agent Gibson drove there. Federal Bureau of Narcotics Agent Robert A. Janet testified that in conducting surveillance he drove by and saw the meeting at Agent Gibson's car on 55th Place. He identified the two defendants as the two men talking to Mr. Farrell. When he drove by again the car had gone. He saw it again in its new location and he parked across from the car of Federal Bureau of Narcotics Agent Charles E. Hill at the Southeast corner of Indiana and Garfield from where he could watch Agent Gibson's car.

Agent Hill testified that he was also observing Agent Gibson's car at 55th Place and he saw both defendants approach it and engage in conversation with Mr. Farrell. He observed the two defendants walking back toward Indiana, north on Indiana, west on Garfield Boulevard and out of view. Agent Hill parked on the Southwest corner of Garfield and Indiana. He saw Agent Gibson's car on Indiana Avenue, north of Garfield Boulevard. He also had radio communication with Agent Janet. Meanwhile Agent Gibson had parked his car near the northeast corner of 55th (Garfield Boulevard) and Indiana, facing north. He saw the co-defendant come from a gangway between buildings on the west side of Indiana and come to the car window where he engaged in a conversation not admitted into evidence as to this defendant and walk north on Indiana Avenue. The co-defendant was quoted as saying that everything was "okay," that defendant had the "jive" and would be coming along shortly.

Over objection, Agent Janet testified to a post-arrest conversation with the co-defendant (admitted solely as to the co-defendant) wherein the co-defendant, after being told that Mr. Farrell was an informant and that the sale had been observed by agents, said that he did not sell to the agents and "well, I guess you got me. I guess I got a case on me." Actually he had spoken in the plural, using "we" and "us" but pursuant to instruction at a side bar conference, Agent Janet limited the statement in accordance with the ruling on its limited admissibility. The co-defendant denied making that statement.

About 5 minutes later defendant came out of the same gangway and up to the car. Mr. Farrell stepped out, and Agent Gibson saw him receive a small tinfoil package from defendant which was promptly given to Agent Gibson. When Mr. Farrell got back into the car, Agent Gibson drove to Washington Park where he met Agents Janet and Hill, turned over the package to Agent Hill and again searched Mr. Farrell for money and narcotics.

Agent Janet saw both defendants come to the car. He saw Mr. Farrell talking to this defendant, return to the

car, and then drive off to Washington Park, as he followed Agent Gibson's car. Defendant makes a point of the fact that Agent Janet had not seen defendant prior to September 22, 1965 when he observed the man at Agent Gibson's car while driving by in conducting his surveillance. Agent Hill who was equipped with binoculars testified that about 7:30 p. m. he observed the co-defendant, and then, a few minutes later, the defendant, come to the car and each converse with Mr. Farrell. When the latter returned to the car and drove off, Agent Hill followed to Washington Park, where Agent Gibson gave him an aluminum foil package containing white powder. He observed Agent Gibson search Mr. Farrell and noted he had neither money nor narcotics. A Marquis reagent field test showed that the white powder contained an opium derivative. Agent Gibson observed the field test and its positive result. The following day the substance was turned over to the United States Chemist in Chicago. It was stipulated that Ferris Van Sickle employed as a chemist by the United States Treasury Department, Alcohol and Tobacco Tax Unit, at Chicago, would testify if called that his tests showed that the substance contained heroin.

The co-defendant testified that he was a heroin addict. Although he knew the defendant, as "Shelby" and was in his company in the vicinity and at the time of the incident described, he denied taking any part in the sale charged or having any conversations with Agent Gibson. On cross examination he testified that he met the defendant while on the way to a restaurant with a friend, that he sent her on ahead while he walked down 56th Street with defendant, that it was dark, that two men in a car called defendant over, that he waited but did not hear the conversation and that when he returned alone the men called him "Tootie" which was his nickname, asked him where "Shelby" had gone, to which he replied he did not know, continuing on his way to the restaurant; that he had come from the friend's home, 57th

and Normal, by bus, getting off at 55th (Garfield Boulevard) and Indiana, that he walked east on Garfield toward the lake turning to go to 55th Place (½ block south of Garfield) when he saw defendant with whom he walked to 56th and Prairie, returning alone, but that he himself never approached the car at which defendant had stopped mid-way to the corner. He testified that he was arrested March 31, 1966, and all his clothing taken away from him to be searched, that the arresting officer, stipulated to be Federal Narcotic Agent Frank J. Boyles, came in wearing fur lined leather gloves, said "You're a boxer," punched him several times (although at one point in his testimony he said the agent did not hurt him) but found nothing on the co-defendant and brought his clothing back to him. Agent Boyles testified that he arrested the co-defendant, removed and took away his clothing for search, and did not see him again for several months. He denied striking him at any time, said he did not know whether the co-defendant was or had ever been a boxer, denied ever giving him any money to purchase drugs to build a case and stated that no force was necessary in making the arrest.

The co-defendant testified that he had been convicted of committing felonies in the past. He said that Agent Janet told him without details that he had three cases against the co-defendant, including taking money under false pretences (which he understood to refer to taking money from a "stool pigeon" and failing to deliver narcotics) as well as a sale and that the co-defendant could help himself by helping the agents. The co-defendant said that in October or November 1965 he had indirectly received money from Agent Boyles with which to get heroin but had not done so. The co-defendant testified on cross-examination that he knew of Federal Bureau of Narcotic Agent Carl Jackson prior to the time of his post-arrest interview by Agent Jackson, but he denied having made a sale of narcotics to him on October 28, 1965, and denied all the details

of this alleged transaction. Agent Jackson testified that he was introduced to the co-defendant, in an undercover capacity, on October 28, 1965, by one Paul Young, an informant. Agent Jackson did not know the whereabouts of Paul Young who had been the informant of Agent Robert J. DeFours who was in Marseilles, France, at the time of the trial. Over objection Agent Jackson was allowed to testify, solely for purposes of impeachment, to the details of a sale of narcotics by the co-defendant. He testified that he next met the co-defendant in the office of the Federal Bureau of Narcotics on March 21, 1966, in a room to which he was led by Agent Janet who then returned to the co-defendant the clothing which had previously been removed for search. When introduced, the co-defendant had stated he already knew Agent Jackson. There was no complaint of any physical abuse by Agent Boyles. In the hearing on motion to suppress, the co-defendant indicated that he had made no complaint of any physical abuse by Agent Boyles. In that hearing the co-defendant indicated that he had made no complaint of physical abuse when he appeared before the U.S. Commissioner later that afternoon, in letters he later wrote the United States Attorney and Agent Jackson or to the United States Marshal when in his custody the day of arrest. The Trial Judge in the course of the hearing on motion to suppress the co-defendant's statement (during which most of the above detail concerning the co-defendant's statement was elicited) implied that he did not credit the co-defendant's testimony respecting alleged physical abuse. Agent Jackson testified that the co-defendant did deny making any sales to an agent but had said "I sold to Nathaniel Farrell."

The defendant denied that he had ever been known as "Shelby Johnson;" denied knowing Nathaniel Farrell; stated he did not recall where he was September 22, 1965, but could have been on 55th Street where he spent a lot of time, passing almost daily in the ordinary course of business. He testified that he was using narcotics sometime in 1964 through to 1966 but that he had never sold narcotics to anyone. He testified to two past felony convictions for robbery on pleas of guilty. He denied knowing by name or sight any federal narcotics agents. He testified on cross-examination that his addiction during the months of August, September and October 1965 cost him about $15 a day; that he was living with his mother, working part time earning about $40 per week, drawing unemployment compensation of about the same amount.

Defendant's view is that the central point at the trial was the failure to produce Nathaniel Farrell who alone, defendant asserts, could testify with authority as to the true identity of "Shelby Johnson."

After the first witness (Agent Gibson) had been examined, prior to cross-examination, in a side bar conference requested by counsel for the co-defendant, the latter asked whether the government was going to call the informant. Government counsel stated that he did not intend to call the informant, whose whereabouts he did not know, that the government had looked for him in vain, that it was believed a warrant of arrest had been issued for the informant and that he was rumored to be in Wisconsin.

Subsequently when Agent Hill testified, he stated that (as Agent Gibson had previously said) Mr. Farrell was "his" informant. He was asked about prior sales and prosecution concerning the informant, but neither he nor Agent Janet was asked about the present whereabouts of the informant. Agent Gibson testified each agent in the Bureau had his "own" informants and that Mr. Farrell was Agent Hill's informant.

Counsel for defendant tendered several instructions, which were rejected, on the failure to produce the informant, arguing that at least the standard instruction from the LaBuy, Manual on Jury Instructions in Federal Criminal Cases, West Publishing Co., 1965, § 6.17

"Missing Witness," should have been given:

> If it is peculiarly within the power of either the prosecution or the defense to produce a witness who could give material testimony on an issue in the case, failure to call that witness creates the presumption that his testimony would be unfavorable to such party. However, no such presumption should be drawn by the jury where the witness is equally available to both parties, or where the witness's testimony would be merely cumulative.

However on the record before us it does not appear it was peculiarly in the power of the government to produce Nathaniel Farrell. It was apparent that the government agents did not know his whereabouts and that efforts to locate him had failed.

The cases on which defendant relies do not seem to help us. Graves v. United States, 1893, 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021, concerned error in permitting the prosecutor in closing argument, over objection, to comment on the absence of the defendant's wife which prevented government witnesses from seeing and identifying her as the woman said to have been with the defendant in Indian country, camping near the scene of the murder with which the defendant was charged. Mr. Justice Brown, speaking for the majority, did say that had the wife been a competent witness, comments on her absence would have been less objectionable, and went on to quote the rule embodied in the above quoted instruction with which no issue as to accuracy is taken. The question is whether the record justifies its use as part of the charge to the jury here.

In McClanahan v. United States, 5 Cir., 1956, 230 F.2d 919, there was a charge of fraudulent procurement of home loan guaranties from the Veteran's Administration. In argument to the jury, government counsel referred to defendant's failure to call as a witness the attorney on whose advice he said he act-ed. The 5th Circuit held (p. 925) that although the attorney was physically available equally to both parties, he was or had been defendant's attorney and that therefore he was not really as "available" to the prosecution as to the defense. The Court then said (p. 926):

> It has been well said that "the availability of a witness is not to be determined from his mere physical presence at the trial or his accessibility for the service of a subpoena upon him. On the contrary, his availability may well depend, among other things, upon his relationship to one or the other of the parties, and the nature of the testimony that he might be expected to give in the light of his previous statements or declarations about the facts of the case". Deaver v. St. Louis Public Service Co., Mo.App., 199 S.W.2d 83, 85.

The Court then went on to discuss waiver of the attorney-client privilege by the testimony of the defendant and concluded that the comment did not constitute error. On the basis of this case and a statement quoted in United States v. Jackson, 3 Cir., 1958, 257 F.2d 41, 44, from 1 Wigmore, Evidence § 288, 3rd Ed. 1940, Supp. 1957, indicating that the term "available" is not to be construed merely as accessibility for service of process, the defense tendered three instructions, as alternatives, construing "availability", one of which read:

> Equal availability is not to be determined by the mere physical accessibility of a particular witness to service of process, but by the testimony which he might ordinarily be expected to give, based upon his relationship to the prosecution and the defense and other attendant facts and circumstances.

*Jackson* involved an issue of entrapment. The Third Circuit held that the informant was an important part of the building up of the case and that it was error to sustain objection to any comment by defense counsel in summation to the jury on the fact that the infor-

mant was not called as a witness. The record did not disclose why he was not called. The Trial Judge had concluded he was equally available to both sides, having even been present in the courtroom for part of the trial.

None of these cases involved instructions; in each case the witness was physically available. In the case before us the testimony adduced at the trial indicated that the whereabouts of the informant was not known to the government witness of whom inquiry was made. Out of the presence of the jury, it was made clear to the defense that efforts to locate him had failed.

■ We cannot agree that the informant was the key witness as defendant contends. Three witnesses identified the defendant under circumstances clearly set forth in their testimony. Agent Gibson saw him from very close range on each of the occasions to which the informant could have testified. Agent Hill who was a short distance away was equipped with binoculars. The defendant's view is that, as the three agents saw the man they now identify as the defendant on only a few occasions whereas the informant was well acquainted with the man, his identification would be much more reliable. We cannot agree that the government was therefore required to call him. Washington v. United States, 5 Cir., 1960, 275 F.2d 687, 690, and cases there cited. See also Velarde-Villarreal v. United States, 9 Cir., 1965, 354 F.2d 9, 12.

■ In his reply brief, defendant concedes that the government is not always obliged to call an informant as a witness, but he contends that the government may exercise its right not to call him only on pain of having the jury instructed as requested by defendant here. We cannot accept that view of the law.

As Count I charges a sale " * * * not in pursuance of a written order * * * " defendant argues that the judgment of conviction must be reversed for want of proof that the sale made here was not in pursuance of a written order on the appropriate form issued for that purpose by the Secretary of the Treasury or his delegate. Defendant relies primarily on Davis v. United States, 1960, 364 U.S. 505, 81 S.Ct. 281, 5 L. Ed.2d 258, wherein the Supreme Court of the United States reversed the judgment with respect to Counts I, II and III of the indictment. The decision of this Court in United States v. Davis, 1960, 281 F.2d 93, had affirmed conviction on all four counts of the indictment. The opinion of the Supreme Court in its entirety reads:

Per Curiam.

Upon consideration of the entire record and the suggestion of the Solicitor General, the petition for writ of certiorari is granted limited to that part of the judgment concerned with Counts I, II, and III of the indictment, and that part of the judgment is reversed and the case is remanded to the District Court for a new trial on Counts I, II, and III. In all other respects the petition for writ of certiorari is denied.

One of the contentions in *Davis* was that proof of Counts I, II and III was defective for failure to prove that the purchaser did not have the requisite written order form. Defendant argues that apparently it was on this basis that the conviction was reversed, thus overruling prior decisions that the government need not negative an exception of this nature. Defendant distinguishes between exceptions listed only in the statute and those included in the indictment itself, a distinction we do not see as valid in this connection. Nor do we agree that the Supreme Court's opinion must have been based on this issue. Other purported errors in *Davis* concerned the charge to the jury (281 F.2d 100). Although defendant in *Davis* had failed to comply with Rule 30, Federal Rules of Criminal Procedure by objecting specifically to the instructions, he argued that plain error had been committed justifying consideration under Rule 52(b).

 As the government points out, since the partial reversal of *Davis*, its rule, that it is not incumbent on the government to prove that purchase was not made with a written order on the prescribed form, has been followed in United States v. Palmiotto, 2 Cir., 1965, 347 F.2d 223, 224–225.

Defendant's last points deal with the statutory presumption in Title 21 U.S.C. § 174:

> Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury.

and an instruction based on it

> The statute relevant to Count 2 provides that whenever it is shown that defendants had possession of the narcotics, such possession shall be deemed sufficient to authorize conviction, unless defendants explain the possession to the satisfaction of the jury.

It is defendant's view that this statutory presumption of guilt from possession violates his Fifth Amendment right not to be called as a witness against himself, as, to avoid the presumption, he would not only have to testify, whether he so wished or not, but would have to admit the possession in order to explain it.

Objection was raised to instruction that:

> If the evidence shows beyond a reasonable doubt that defendant has possession of the narcotic, then it is not necessary for the Government to show that it was unlawfully imported, or that defendants knew it was unlawfully imported.

on the ground that this reduces the offense to one of mere possession.

At the time this cause was orally argued before us there was pending in the Supreme Court of the United States a case in which these issues had been raised: James Turner v. United States. The Supreme Court handed down its opinion in that matter on January 20, 1970, 396 U.S. 398, 90 S.Ct. 642, 24 L. Ed.2d 610, deciding these questions adversely to defendant's views, with respect to heroin, the narcotic with which we are here concerned. Furthermore, other instructions given by the trial judge obviated possible prejudice to the defendant.

We have considered with care all arguments advanced and all authorities cited. We conclude that the judgment of the District Court must be affirmed.

The Court is grateful for the efforts of Mr. Ronald P. Alwin of the Illinois Bar who represented the defendant in this Court with skill and dedication as Court appointed counsel under the Criminal Justice Act.

Affirmed.