**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Charles Larue KING, Defendant-Appellant.**

**No. 72-1425.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Nov. 14, 1972.

Decided Aug. 29, 1973.

Rehearings Denied Nov. 15, 1973.

---

Don J. Svet, Asst. U. S. Atty. (Victor R. Ortega, U. S. Atty., and Richard J. Smith, Asst. U. S. Atty., on the brief), for plaintiff-appellee.

Julius Lucius Echeles, Chicago, Ill., (Carolyn Jaffee, Chicago, Ill., and Thomas L. Marek, Albuquerque, N. M., on the brief), for defendant-appellant.

Before LEWIS, Chief Judge, Mc-WILLIAMS, Circuit Judge, and CHRIS-TENSEN, District Judge.

McWILLIAMS, Circuit Judge.

Charles LaRue King was convicted by a jury of knowingly possessing with an intent to distribute approximately 602 pounds of marijuana, a Schedule I controlled substance under 21 U.S.C. § 812(c), (c)(10), in violation of 21 U.S.C. § 841(a)(1). King now appeals and his various grounds of assigned error will be grouped as follows: (1) The statute under which King was prosecuted, namely, 21 U.S.C. § 841(a)(1), is unconstitutional; (2) the search of his car and the seizure therefrom of 300 bricks of marijuana was in violation of his Fourth Amendment rights; (3) his Fifth Amendment privilege against self-incrimination was violated; and (4) the evidence in several particulars is legally insufficient to support the verdict. Brief reference to the facts and circumstances surrounding King's arrest will put these several matters in context.

A border patrol agent stopped an automobile driven by King at a so-called checkpoint station located about three

miles north of Truth or Consequences, New Mexico, the agent testifying that he was stopping all vehicular traffic to look for "illegal aliens." After stopping King, the agent inquired as to his citizenship, with King responding that he was an "American." The agent then directed King to pull over to the side and open his trunk, the agent testifying that he wanted to ascertain whether there were any aliens hiding in the trunk. King complied with these directions, and as he was in the process of opening the trunk he volunteered a statement to the effect that "Yes, you made a good catch this time."

The agent's testimony was that as he looked into the opened trunk he saw no person hiding therein, but that he did see what appeared to him to be "bricks of marijuana across the shelf, the back shelf in the car, and a tarp covering something and a tire laying on top of the tarp." The agent outlined his past experience with bricked marijuana and testified that based thereon he concluded that the bricks in King's trunk were bricks of marijuana. Accordingly, the agent arrested King and the 300 bricks of marijuana taken from King's trunk form the basis for the present prosecution. Further background material will only be developed as necessary to an understanding of King's various grounds of alleged error.

### I.

■ King initially contends that the statute under which he was convicted is unconstitutional. It is argued that Congress had no power to enact 21 U.S.C. § 841(a)(1) under which one could be convicted for purely intrastate activity, and that since there is no specific grant of power to enact a statute of the broad scope of § 841(a)(1), the matter is one reserved to the several states under the Tenth Amendment. It is clear from a reading of the statute under which King was convicted that there indeed need be no connection, as such, between the facts of a particular case and interstate commerce. However, in this general regard,

mention should be made of Congressional findings and declaration of legislative intent as set forth in 21 U.S.C. § 801(3), which read as follows:

"(3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because—

"(A) after manufacture, many controlled substances are transported in interstate commerce,

"(B) controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and

"(C) controlled substances possessed commonly flow through interstate commerce immediately prior to such possession."

Quite obviously, then, it was the intent of Congress to enact a statute which would cover the facts of the instant case. There remains the issue as to whether Congress has the power to thus enact. We are advised that two other Courts of Appeals have been presented with this same issue and that each has held § 841(a) to be a valid exercise by Congress of the power granted it under the commerce clause. United States v. Scales, 464 F.2d 371 (6th Cir. 1972), and United States v. Lopez, 459 F.2d 949 (5th Cir. 1972). Without detailing the reasoning of those two cases, we subscribe thereto and hold that § 841(a) is a valid exercise by Congress of a power vested in it by the Constitution.

■ King also challenges the constitutionality of § 841(a) on a different ground. One essential ingredient of § 841(a) is that the possession of the controlled substance must be with an "intent to distribute." The "intent" with which a controlled substance is possessed

is generally established through circumstantial evidence and in this regard we have held that the quantity of the drug possessed is a circumstance which may permit the inference that the possessor had an intent to sell, deliver or otherwise distribute. United States v. Ortiz, 445 F.2d 1100 (10th Cir. 1971), cert. denied, 404 U.S. 993, 92 S.Ct. 541, 30 L. Ed.2d 545 (1971). King argues that § 841(a) is constitutionally deficient because it fails to state "how much" of the controlled substance is necessary to permit the inference that the possessor had an intent to distribute. We deem this argument of the alleged vagueness of the statute to be without merit. The statute clearly, and without vagueness, makes unlawful the possession of any controlled substance with an intent to distribute. The question as to the quantity which would permit the inference that the possessor had an intent to distribute is evidentiary in nature and necessarily depends upon all the facts and circumstances of the case at hand, and mention thereof in the statute is entirely unnecessary.

■ Brief mention is also made concerning the provisions of § 841(b)(4) which provides that one who violates § 841(a) "by distributing a small amount of marijuana for no remuneration" shall be treated as provided for in another section of the statute, i. e., § 844(a) and (b). In this regard, King suggests that the phrase "small amount of marijuana" is unconstitutionally vague. King, however, was indicted and convicted for violating § 841(a) and the evidence showed he possessed over 600 pounds of marijuana, and the quantity thus possessed clearly supported the inference that he intended to distribute the controlled substance. Hence, under such circumstances the provisions of § 841(b)(4) are not brought into play, and accordingly we need not here concern ourselves with the argument that the language used in this particular section of the statute is vague.

## II.

Complaint is next made by King that the search of his car and the seizure therefrom of the 300 bricks of marijuana was an unlawful search and seizure. In this regard, King filed a motion to suppress which, after an evidentiary hearing, was denied. King now assigns this ruling as error.

This search is sought to be upheld under 8 U.S.C. § 1357(a)(3), which allows Immigration Officers to stop and search any vehicle for aliens "within a reasonable distance from any external boundary of the United States." The term "reasonable distance" is defined at 8 C. F.R. § 287.1 as being one hundred air miles. King contends that the search and seizure was improper because: (a) There was insufficient evidence that the checkpoint at Truth or Consequences is within one hundred air miles from the Mexican border; (b) the provisions of 8 U.S.C. § 1357(a)(3) which purported to empower the Attorney General to determine what is a "reasonable distance" from an external boundary are violative of the Fourth Amendment under the reasoning of Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L. Ed.2d 564 (1971); and (c) the aforesaid statute and the regulation promulgated thereunder purporting to authorize warrantless searches of automobiles without probable cause for aliens at a fixed checkpoint some ninety-eight miles from an external boundary violates the Fourth Amendment under the reasoning of the recent case of Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). Although we are of the view that *Almeida-Sanchez* does have application to the instant case, and requires a remand for further hearing, in view of the remand each of these several contentions should be considered now.

■ King initially argues in this court that there is no competent evidence that the checkpoint near Truth or Consequences, New Mexico, is within

one hundred air miles of the Mexican border. This particular matter in our view was not really raised in the trial court, and for that reason will not be considered by us. It is true that in the hearing on the motion to suppress, counsel for King in his examination of the border patrol agent inquired as to how far the checkpoint at Truth or Consequences was from the Mexican border. The agent testified it was ninety-eight air miles, whereupon counsel established that the agent himself had never flown from the border to the checkpoint and that his testimony was hearsay in nature.

At this point, the Government attorney objected. In so doing, the Government attorney stated that he had not intended to prove mileage distance through the agent, but would do so through another witness, who apparently was not immediately available, the motion to suppress having come on for hearing some six hours after he had been served with a copy. In this setting, counsel for King indicated that he had no desire to take the Government by surprise, but stated that distance was one of the issues and "when we establish distance, if and when we do, there will be further arguments, legal arguments that I propose to present to the court."

Thereafter, the issue of distance from the border was dropped and never again raised in the trial court, be it during the balance of the hearing on the motion to suppress, or at the trial proper. Apparently it was thereafter assumed by all that the checkpoint was within the one hundred mile limitation. In this setting we are disinclined to seriously consider on appeal the belated contention that the checkpoint in question was more than one hundred miles from the Mexican border. In so doing, we are fortified by United States v. Anderson, 468 F.2d 1280 (10th Cir. 1972), and United States v. McCormick, 468 F.2d 68 (10th Cir. 1972), both of which concerned the same checkpoint as the one involved in the instant case, and in each of those cases the checkpoint with which we are here concerned was found to be ninety-eight miles from the border.

King next argues that the statute which purports to empower the Attorney General to define what is a "reasonable distance" from an external boundary is violative of the Fourth Amendment under the reasoning of Coolidge v. New Hampshire, *supra*. In *Coolidge*, it was held that the Fourth Amendment requires that a search warrant be issued by a "neutral and detached magistrate," and not by, for example, a state's attorney general. Analogizing, it is asserted that any determination as to what is a "reasonable distance" from an external boundary of the United States should be by a "neutral," and not by a law enforcement official such as the Attorney General of the United States.

We do not read *Coolidge* as requiring a holding that 8 U.S.C. § 1357(a)(3) and 8 C.F.R. § 287.1 violate the Fourth Amendment. Though there may be some similarities between *Coolidge* and the instant case, there are important dissimilarities too.

In *Coolidge*, the Supreme Court was concerned with the delicate question as to *who* should determine the existence of "probable cause," which under the Fourth Amendment is a prerequisite to the issuance of a search warrant. It was in this setting that the Supreme Court held that the determination of the existence of probable cause should be by a neutral, and not by, as it was in *Coolidge*, the state's attorney general.

In the instant case, we are not concerned with any aspect of probable cause. Border searches are a separate category of searches, and are not dependent upon probable cause for their validity. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1924); Murgia v. United States, 285 F.2d 14 (9th Cir. 1960), cert. denied, 366 U.S. 977, 81 S.Ct. 1946, 6 L.Ed.2d 1265 (1961); Mansfield v. United States, 308 F.2d 221 (5th Cir. 1962). So, the determination by the Attorney

General under 8 U.S.C. § 1357(a) is not one relating in anywise to probable cause, but is simply an administrative determination authorized by statute as to what is a reasonable distance from the external boundary of the United States, within which, under *Almeida-Sanchez*, as will be developed in a moment, the "functional equivalent" of a border search may be conducted without probable cause, and without the sanction of a warrant. It is on this line of reasoning that we deem *Coolidge* to be inapplicable to the present controversy.

█ King next argues that the statute and regulation, which was the purported basis for the search of his car and seizure therefrom of the bricks of marijuana, is, when applied to the facts of his case, violative of the Fourth Amendment under *Almeida-Sanchez, supra.* We note parenthetically that the opinion in the instant case has been held in abeyance awaiting the decision by the Supreme Court in *Almeida-Sanchez.* Subsequent to the announcement of that decision on June 21, 1973, the parties to the instant proceedings have filed supplemental briefs setting forth their respective views as to how *Almeida-Sanchez* affects the disposition of the present controversy.

As we understand the majority opinion in *Almeida-Sanchez*, the holding was that the statute and regulation here under attack were unconstitutional in their application where such formed the basis for a "roving search" of an automobile for illegal aliens without warrant and without probable cause, twenty-five air miles from the Mexican border. In like fashion, it would seem to us, the reasoning of the majority dictates the same result when applied to a search of an automobile for illegal aliens made without warrant and without probable cause at the fixed checkpoint outside Truth or Consequences, New Mexico, unless such search be deemed the functional equivalent of a border search. In this latter regard, the majority opinion clearly indicates that a border search is not limited to searches at the actual border itself,

and that a border search may take place at "its functional equivalents as well." From the record before us, however, we cannot tell whether it is or is not the functional equivalent of a border search, and accordingly, as we will elaborate upon, *infra*, we propose to remand this case to the trial court for an evidentiary hearing on this particular matter.

As concerns *Almeida-Sanchez*, we do not propose to analyze, sentence-by-sentence, the majority opinion, authored by Mr. Justice Stewart, and concurred in by Justices Douglas, Brennan, Marshall, and Powell, nor the separate concurring opinion of Mr. Justice Powell, nor the dissenting opinion of Mr. Justice White, concurred in by the Chief Justice and Justices Blackmun and Rehnquist. Sentences therein when read in isolation might indicate that the present search is constitutional, regardless of whether the checkpoint search was the functional equivalent of a border search. Notwithstanding, as indicated, as we read and understand the majority opinion, as applied to the instant case, a search at a fixed checkpoint of an automobile for aliens without warrant and without probable cause, ninety-eight miles away from the external boundary, is unlawful, unless the particular fixed checkpoint be in fact a functional equivalent of a border search.

The Government makes some argument that even if *Almeida-Sanchez* renders unlawful the warrantless search without probable cause of an automobile at the Truth or Consequences checkpoint, the rule should not be given retroactive effect to the benefit of King. In our view, that argument has no application to one in King's position. King, like *Almeida-Sanchez*, challenged on constitutional grounds the validity of the statute and regulation throughout the trial court proceedings and has pursued his challenge in this court as well. And King now asks that he be given the same relief as has been afforded in *Almeida-Sanchez*. We agree.

█ It is for these reasons that we propose to vacate the judgment and sen-

tence heretofore entered and remand the case to the trial court for a determination, after hearing, and upon notice, as to whether the checkpoint at Truth or Consequences is the "functional equivalent" of a border search as that phrase is used in *Almeida-Sanchez*. If the trial court finds that it is, the judgment and sentence should be reinstated. However, if the trial court should determine that the checkpoint here involved is not the functional equivalent of a border search, then the case should be dismissed, as, under Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), the 300 bricks of marijuana should not have been admitted as evidence, and without the marijuana the Government's entire case falls.

### III.

A special agent in the Bureau of Customs arrived at the checkpoint station in question some three hours after King had been placed under arrest by the border patrol agent. This special agent testified at trial in front of the jury that he advised King of his *Miranda* rights and that in response thereto King stated he wanted to cooperate, but still wanted "to talk to my lawyer." Objection was made to this testimony and counsel for King requested a mistrial. The trial court refused to declare a mistrial, although he did stop further questioning along this line. Counsel now argues that the trial court erred in refusing to declare a mistrial. We disagree.

We do agree that it is error for the Government to introduce as part of its case evidence that a defendant at the time of his arrest exercised his Fifth Amendment right and declined to make any statement to the arresting officer or, in like vein, only indicated a desire to consult counsel. United States v. Arnold, 425 F.2d 204 (10th Cir. 1970), and United States v. Nolan, 416 F.2d 588 (10th Cir. 1969), cert. denied, 396 U.S. 912, 90 S.Ct. 227, 24 L.Ed.2d 187 (1969). However, under the circumstances we deem such error in the instant case to be harmless beyond a reasonable doubt, and accordingly we should not reverse. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), and Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

In support of our determination that the error in the instant case was harmless, we note that the only objectionable evidence is the statement attributed to King that though he would like to cooperate, he still wanted to first talk to an attorney. The matter was dropped at that point and never thereafter alluded to in any manner. In both *Arnold* and *Nolan* it was the comment by Government counsel in closing argument that apparently required a reversal. Indeed, in *Arnold* we stated that the objectionable testimony, "standing alone, might well be considered harmless." And here, the objectionable testimony is in fact standing quite alone. Additionally, King's statement that he wanted to talk to an attorney was not nearly as damning as his earlier volunteered utterance while opening the trunk lid: "Yes, you made a good catch this time." Suffice it to say, the violation of King's Fifth Amendment rights under such circumstances was indeed harmless.

### IV.

King's final assignment of error relates to the legal sufficiency of the evidence. In this connection, King initially contends that the Government's evidence failed to establish that the substance found in his car was marijuana within the statutory definition of that term. A chemist for the United States Customs Laboratory testified that the substance taken from King's car was marijuana and went on at great length to outline his testing process and the results thereof. His testimony in our view was amply sufficient to make out a prima facie case that the substance in King's possession was marijuana as such is defined by the statute.

Counsel attempts to make much of the fact that the chemist described the substance as "cannabis sativa" and not as

"cannabis sativa L." as described in the statute. The omission of the suffix "L" is not fatal. We are advised that the "L" in "cannabis sativa L." refers only to Carl von Linne (Linnaeus), the Swedish taxonomist who developed the classification system through which plants have been identified and distinguished. The "L" simply denotes that the Linnaean system of classification has been followed; the "L" itself does not qualify the identification of "cannabis sativa" in any way. Cf. United States v. Moore, 446 F.2d 448 (3d Cir. 1971), cert. denied, 406 U.S. 909, 92 S.Ct. 1617, 31 L. Ed.2d 820 (1972); Shurman v. United States, 233 F.2d 272 (5th Cir. 1956); and State v. Romero, 74 N.M. 642, 397 P.2d 26 (N.M.1964). In *Moore* appears the following pertinent comment 446 F. 2d at 450:

> "Marihuana, a term of Mexican origin, is the dried leaves and flowering tops of a plant species commonly known as hemp. Botanically, the hemp plant is called Cannabis sativa L. There is only one species of this plant. Leary v. United States, 395 U. S. 6, 50, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1959). However, because of the difference in soil content and climatic conditions, the plant grown in various parts of the world is not physically the same. For example, Mexican marihuana is more potent than domestic and is consequently preferred by smokers. Leary v. United States, supra, at 49, 89 S.Ct. 1532. Cannabis indica is the name given to Cannabis sativa L. grown in India. 12 C.J.S. Cannabis pp. 1111, 1112. We agree with the District Court that 'Congress intended the inclusion of the indica variety within the definition of marihuana as set forth in 26 U.S.C. § 4761(a).' * * *."

Counsel also argues that the Government's evidence failed to negate the exception contained in 21 U.S.C. § 828(a) which provides that it is unlawful to actually distribute a controlled substance, except pursuant to a written order form provided by the Attorney General. In this regard, it is sufficient to say that King was not prosecuted under 21 U.S.C. § 828(a), but under 21 U. S.C. § 841(a). Additionally, the Government need not in its case negate an exception of the type alluded to above. *See* United States v. Peterson, 424 F.2d 1357 (7th Cir. 1970), cert. denied, 400 U.S. 958, 91 S.Ct. 357, 27 L.Ed.2d 266 (1970); Daniels v. United States, 402 F.2d 30 (9th Cir. 1968); and United States v. Palmiotto, 347 F.2d 223 (2d Cir. 1965).

Accordingly, the judgment is vacated and the matter is remanded to the trial court with direction that it make a determination, after hearing and upon notice, as to whether the checkpoint with which we are here concerned is the "functional equivalent" of a border search under *Almeida-Sanchez*. If the trial court shall find that the checkpoint is the functional equivalent of a border search, then the judgment and sentence shall be reinstated. However, should the trial court determine that the checkpoint herein involved is not the functional equivalent of a border search, then the trial court shall dismiss the case.